# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**JAMES JERMAINE DAVIS,**

    Petitioner,

    v.                                                             Case No. 14-CV-1444

**WILLIAM POLLARD,**

    Respondent.

## DECISION AND ORDER DENYING PETITION
## FOR WRIT OF HABEAS CORPUS AND DISMISSING CASE

James Jermaine Davis, a Wisconsin prisoner, petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Davis challenges his custody on sufficiency of the evidence grounds involving his convictions for attempted first degree intentional homicide while armed, party to a crime; first degree recklessly endangering safety while armed, party to a crime; and felony bail jumping. He argues that the State failed to prove beyond a reasonable doubt that he was the direct actor or that he somehow aided and abetted in the commission of the crimes. The respondent answered the petition and the parties subsequently briefed the petition. For the reasons explained below, Davis' petition is denied and the case will be dismissed.

## BACKGROUND

Davis was charged with first degree intentional homicide as party to a crime while armed with a dangerous weapon; first degree recklessly endangering safety as a party to the crime with a dangerous weapon; and felony bail jumping in Milwaukee County case number 2010CF1281 as the result of an incident that occurred on March 9, 2010. Davis went to trial on the charges. At trial, the witnesses testified, in relevant part, as follows:

Jovan Washington testified that he met a woman named Trish on the evening of March 9, 2010 while he was at a club. (Jury Trial Tr., September 13, 2010 P.M., Docket # 14-6 at 87.) They decided to get breakfast after the club closed. (*Id.*) Washington and Trish left in two cars; he followed her to her house, where she left her car and then joined him in his vehicle. (*Id.* at 88-89.) He was driving a '97 red Chevy Tahoe. (*Id.* at 88.) As they were driving, another car pulled up beside Washington. (*Id.* at 89.) He identified Davis as the driver of that vehicle. (*Id.* at 90.) Washington testified that when Davis pulled up beside them, Davis told him that he should not deal with "that young lady" and said that he was going to "bust all the windows out of her car." (*Id.* at 91.) Washington believed Davis may have said something about Trish having some kind of disease. (*Id.* at 92.) Washington testified that Davis had not threatened him. (*Id.* at 102-04.) Davis and Trish were "arguing back and forth," and he was under the impression that Davis did not want him spending time with Trish. (*Id.* at 92.)

Because Davis had threatened to bust the windows out of her car, Trish was worried about her car. (*Id.* at 93.) They returned to her car and moved it in front of Davis' friends' house. (*Id.*) They then left and eventually were stopped at the intersection of Sherman and Hampton. (*Id.*) At that time, Washington saw the car in which he had seen Davis coming through the intersection. (*Id.* at 94.) About five to ten minutes had passed since he had last seen the car. (*Id.*) Washington then made a left on to Hampton. (*Id.* at 94.) The car he had seen Davis in was heading the same direction as him on Hampton and was in the outside lane; he was driving in the inside lane. (*Id.* at 95-96.) The car slowed down, and as Washington drove past, "gunshots rang out." (*Id.*) He testified that he did not see the driver of the car; he could not identify Davis as being there when shots were fired. (*Id.* at 104, 105.) On cross examination, Washington testified that he did not know for sure that the shots

came from the car that he saw. (*Id.* at 106.) The other vehicle was behind him at the time. (*Id.* at 96.) Washington felt a wound on his head, and he accelerated and continued to head west on Hampton. (*Id.*) He continued to hear gunshots, though he could not recall how many. (*Id.* at 96-97.) The bullet had grazed the side of his head, leaving a scar. (*Id.* at 98-99.) At the hospital, a detective from the Milwaukee Police Department showed him a photo lineup, and he identified Davis (*id.* at 100) as the driver of the vehicle the first time he saw it (*id.* at 105). He also gave the detective permission (and his keys) to search his vehicle. (*Id.*)

Milwaukee police officer Jacob Spano also testified. (*Id.* at 110.) He was working the late shift on March 9, 2010 into the morning of March 10, 2010. (*Id.*) Spano was sent to the scene of the shooting and shortly after arriving put out a description of the suspect's vehicle—a burnt orange newer model Pontiac Grand Prix. (*Id.* at 111.) Spano went to the area of North 44th Street and West Hampton Avenue to begin searching for the vehicle. (*Id.*) While stopped at a light at the intersection of East Capitol and West Appleton, Spano observed a vehicle traveling eastbound in the far left lane on West Appleton Avenue, which was a maroon newer model Pontiac Grand Prix. (*Id.* at 112.) Spano began following the vehicle, attempting to catch up with it. (*Id.* at 112-13.) When he caught up to the vehicle, he activated the emergency lights on his fully marked squad car and conducted a traffic stop of the vehicle. (*Id.* at 113.) He was able to tell that there were two black males in the vehicle but could make out no further details. (*Id.*) Spano eventually identified the driver of the vehicle as Davis. (*Id.* at 118.) He estimated that about 20 minutes passed between receiving the initial dispatch about the car and pulling over Davis. (*Id.* at 121.)

Spano testified that when he first approached the vehicle, he shined his flashlight into the back window to see how many people were in the car. (*Id.* at 119.) He testified that the first thing that

caught his eye was a spent casing that was wedged between the window gasket and the trunk. (*Id.*) The casing was a nine millimeter casing. (*Id.* at 120.) Eventually, he placed Davis under arrest for outstanding warrants. (*Id.*) Spano testified that because he believed the car was involved in the shooting, he notified his sergeant, and the car was eventually searched. (*Id.*)

Milwaukee Police Detective Shannon Jones also testified at Davis' trial. (Jury Trial Tr., September 14, 2010 A.M., Docket # 14-7 at 18.) He testified that he was working the late shift on March 9 to March 10, 2010 and was dispatched to a shooting at the 4600 block of West Hampton Avenue. (*Id.* at 19-20.) He arrived at approximately 3:15 a.m., and he testified that the area was well lit by the street lighting. (*Id.* at 20.) Jones identified evidence collected at the scene, including 9 millimeter shell casings. (*Id.* at 21-22.) He testified that he collected six casing in the outside lane heading west on Hampton, which would be, in his opinion, consistent with a gun being fired from a vehicle traveling westbound on Hampton. (*Id.* at 24.) Jones testified that the locations of the casings would be inconsistent with a shooter standing in one place shooting at a moving target. (*Id.*) They also found small, fragmented pieces of tinted glass, which Jones speculated came from a car window. (*Id.* at 24-25.)

Another Milwaukee Police detective, Shannon Lewandowski, also testified at the trial. (*Id.* at 26.) She was working the late shift on March 10, 2010—midnight to 8:00 a.m.—and was dispatched to 70th and Melvina, the second part of the shooting scene where Officer Spano had stopped a car. (*Id.* at 29-30.) The car was a four door, maroon Grand Prix. (*Id.* at 30.) Lewandowski noted that the description over the radio had been a burnt orange car. (*Id.*) Lewandowski identified Davis as the driver of the car and indicated there was another individual present. (*Id.* at 31.) Officer Spano reported that he had stopped the vehicle and approached the driver's side, at which time he

- 4 -

noticed a casing "wedged in the crease where the trunk lifts and the window comes down of the back of the window." (*Id.* at 31-32.) The shell casing was on the back of the car. (*Id.* at 33.) She could not state exactly how it got there. (*Id.* at 45-46.) It was a 9 millimeter casing. (*Id.* at 35.) Lewandowski testified that she then communicated with the detectives at the other scene about what they had recovered. (*Id.* at 36-37.) She then went to the hospital where Washington was being treated to interview him. (*Id.* at 37-39.) Davis was arrested for being the shooter; Lewandowski noted that Washington had identified Davis from a photo array. (*Id.* at 40.)

Lewandowski further testified that they did not test Davis' hands or the car for gunshot residue and that it was not something the department usually does. (*Id.* at 40-41.) No gun was recovered when the car was searched nor when either occupant of the car was searched. (*Id.* at 42.)

An employee at the State Crime Lab, Reginald Templin, testified next at the trial. (Jury Trial Tr., September 14, 2010 P.M., Docket # 14-8 at 5.) He testified that he worked as a firearm and tool mark examiner and was in charge of the Firearm and Tool Mark section in the laboratory. (*Id.*) He explained that his job is to examine and report on firearms and any firearm related evidence. (*Id.*) Templin examined the shell casings recovered at the scene (*id.* at 10-11) and concluded that all seven casings were fired from the same firearm (*id.* at 11).

Next, Luke O'Day, a detective with the Milwaukee Police Department, testified. (*Id.* at 13.) On March 10, 2010, he was dispatched to St. Joseph's hospital to meet up with a victim, Jovan Washington, and conduct an interview. (*Id.* at 15.) O'Day testified that Washington appeared to be in pain and had a graze wound to the right side of his head and an impact wound between his shoulder blades. (*Id.* at 16.) He conducted a photo array with Washington, and Washington identified Davis. (*Id.* at 18-19.)

O'Day testified that upon examining Washington's vehicle, a red Chevy Tahoe, they recovered a jacketing from the driver's side passenger seat (*id.* at 20), a jacketing in the rear cargo area of the Tahoe (*id.* at 21), and a "fired deformed lead projectile bullet" in the driver's seat (*id.*). He testified that there was damage to the car, mostly centered on the passenger side rear quarter panel. (*Id.* at 22.) O'Day returned to see the Tahoe on March 12, 2010 with an identification technician and used trajectory rods, which are used to determine the flight path of a bullet as well as to determine the angle in which a bullet was fired. (*Id.* at 23.) O'Day testified that once they used the trajectory rods on the Tahoe, he concluded that all of the bullets traveled from the rear right of the vehicle to the front left of the vehicle. (*Id.* at 27.) He testified that "the shooter would have been placed at an angle behind the vehicle," consistent with cars being in lanes next to each other and the front of the shooter's vehicle overlapping a little bit with the back of the vehicle that was shot. (*Id.* at 27-28.) O'Day also testified that the bullets' trajectory came from a lower angle, suggesting that the second vehicle (the shooter's vehicle) was a sedan rather than a taller SUV like Washington's Tahoe. (*Id.* at 29.)

O'Day then testified about the casing lodged between the trunk lid and the back window. (*Id.* at 29-30.) He believed that the location of the casing indicated that the person who fired the gun did so from the driver's side of the vehicle. (*Id.* at 30.) He explained that when a semiautomatic handgun ejects the casing, it goes up and out the right side of the handgun. He did not believe that if the gun was fired by someone leaning out of the passenger window that the casing would have landed on the trunk lid. (*Id.*) He also noted that if the passenger had put the firearm over the top of the vehicle, he would expect that the impacts on the Tahoe would have been much higher. (*Id.* at 31.) O'Day testified that he did not believe a casing could have fallen on to the trunk if the gun had been fired

out of a vehicle in front of Davis'. (*Id.* at 32-33.) He also did not believe that someone standing still on the sidewalk could have fired shots matching the trajectories they found. (*Id.* at 36.)

Following the jury trial, Davis was convicted of all three crimes: first degree intentional homicide as party to a crime while armed with a dangerous weapon; first degree recklessly endangering safety as a party to the crime with a dangerous weapon; and felony bail jumping on September 15, 2010. (Judgment of Conviction, Docket # 14-1.) He was sentenced to concurrent sentences on all of the charges, the longest of which (for the attempted homicide) is 26 years—16 years of initial confinement and 10 years of extended supervision.

Davis appealed his convictions. His appellate counsel filed a no-merit report, pursuant to *Anders v. California*, 386 U.S. 738 (1967). (Ct. App. Dec. in 2012AP120-CRNM, Docket # 1-1 at 1-2.) Davis filed multiple responses, and counsel filed two supplemental no-merit reports. (*Id.* at 2.) The court of appeals examined Davis' three arguments: a challenge to the sufficiency of the evidence; challenges to the effective assistance of trial counsel; and a claim that he was sentenced on inaccurate information. The court of appeals upheld his conviction, and Davis petitioned for review with the Wisconsin Supreme Court (Docket # 14-3), which was denied on November 26, 2013 (Docket # 14-4). On November 17, 2014, Davis filed the petition presently before me.

## STANDARD OF REVIEW

The habeas corpus statute was amended by the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub.L. No. 104-132, 100 Stat. 1214, which provides in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

This provision entitles federal courts acting within their jurisdiction to interpret the law independently, but requires them to refrain from "fine tuning" state court interpretations. *Lindh v. Murphy*, 96 F.3d 856, 870-77 (7th Cir. 1996), *rev'd on other grounds*, 521 U.S. 320 (1997). "Thus, although this court reviews the state court's legal conclusions and mixed questions of law and fact de novo, that review is 'tempered by AEDPA's deferential constraints.'" *Hereford v. McCaughtry*, 101 F. Supp. 2d 742, 746 (E.D. Wis. 2000) (quoting *Sanchez v. Gilmore*, 189 F.3d 619, 623 (7th Cir. 1999)).

A state court's decision is "contrary to . . . clearly established Federal law as established by the United States Supreme Court" if it is "substantially different from relevant [Supreme Court] precedent." *Washington v. Smith*, 219 F.3d 620, 628 (7th Cir. 2000) (quoting *Williams v. Taylor*, 120 S.Ct. 1495, 1519 (2000)). The court of appeals for this circuit recognized the narrow application of the "contrary to" clause:

> [U]nder the "contrary to" clause of § 2254(d)(1), [a court] could grant a writ of habeas corpus . . . where the state court applied a rule that contradicts the governing law as expounded in Supreme Court cases or where the state court confronts facts materially indistinguishable from a Supreme Court case and nevertheless arrives at a different result.

*Washington*, 219 F.3d at 628. The court further explained that the "unreasonable application of" clause was broader and "allows a federal habeas court to grant habeas relief whenever the state court 'unreasonably applied [a clearly established] principle to the facts of the prisoner's case.'" *Id.* (quoting *Williams*, 120 S.Ct. at 1523).

For an application of federal law to be unreasonable, a state court ruling must be more than simply "erroneous" and perhaps more than "clearly erroneous." *Hennon v. Cooper*, 109 F.3d 330, 334 (7th Cir. 1997). Under the "unreasonableness" standard, a state court's decision will stand "if it is one of several equally plausible outcomes." *Hall v. Washington*, 106 F.3d 742, 748-49 (7th Cir. 1997). In *Morgan v. Krenke*, the court explained that:

> Unreasonableness is judged by an objective standard, and under the "unreasonable application" clause, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."

232 F.3d 562, 565-66 (7th Cir. 2000) (quoting *Williams*, 120 S.Ct. at 1522), *cert. denied*, 532 U.S. 951 (2001). Accordingly, before a court may issue a writ of habeas corpus, it must determine that the state court decision was both incorrect and unreasonable. *Washington*, 219 F.3d at 627.

Similarly, for a state court's determination of fact to be unreasonable under 28 U.S.C. § 2254(d)(2), the habeas court must more than "merely" determine it "would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 130 S.Ct. 841, 849 (2010) (internal citations omitted). That is, "even if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the [state] court's . . . determination.'" *Id.* (citing *Williams v. Taylor*, 529 U.S. 362, 341-42 (2000)).

## ANALYSIS

In his habeas petition, Davis argues that there was insufficient evidence to support his convictions for attempted first degree intential homicide as a party to the crime while using a dangerous weapon and first degree recklessly endangering safety while using a dangerous weapon. He also argues, as a part of this argument, that there was no evidence to convict him as a party to

- 9 -

the crime. Davis argues that the court of appeals' decision was an unreasonable application of federal law and an unreasonable determination of the facts.

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime for with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). When insufficiency of evidence is asserted as the basis for a habeas petition, the petitioner must show "'upon the record evidence adduced at the trial no rational trier fact could have found proof beyond a reasonable doubt.'" *Cabrera v Hinsley*, 324 F.3d 527, 533 (7th Cir. 2003) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 324 (1979)). The inquiry does not require the federal habeas court to "ask itself whether *it* believes that the evidence at trial established guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (citing *Woodby v. INS*, 385 U.S. 276, 282 (1966)). Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

A federal habeas court determines the sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law. *See Jackson*, 443 U.S. at 324 n. 16. Under Wisconsin law, a defendant is guilty of attempted first degree intentional homicide if he attempts to "[cause] the death of another human being with intent to kill that person or another." Wis. Stat. § 940.01(1)(a). A defendant is guilty of first degree recklessly endangering safety if he "recklessly endangers another's safety under circumstances which show utter disregard for human life." Wis. Stat. § 941.30(1).

Wisconsin "parties to crime" statute outlines who may be charged and convicted of the commission of a crime.

- 10 -

> (1) Whoever is concerned in the commission of a crime is a principal and may be charged with and convicted of the commission of the crime although the person did not directly commit it and although the person who directly committed it has not been convicted or has been convicted of some other degree of the crime or of some other crime based on the same act.
>
> (2) A person is concerned in the commission of the crime if the person:
>
> > (a) Directly commits the crime; or
> >
> > (b) Intentionally aids and abets the commission of it; or
> >
> > (c) Is a party to a conspiracy with another to commit it or advises, hires, counsels or otherwise procures another to commit it.

Wis. Stat. § 939.05.

In considering Davis' sufficiency of the evidence argument, the Wisconsin Court of Appeals used a standard consistent with, and indeed nearly identical to, the applicable federal law found in *Jackson v. Virginia*. (*See* Docket # 1-1.) Citing to *State v. Poellinger*, 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990), the Wisconsin Court of Appeals stated:

> In reviewing the sufficiency of the evidence to support a conviction, we may not substitute our own judgment for that of the trier of fact unless the evidence, viewed most favorably to the verdict, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found the requisite guilt. Therefore, if more than one reasonable inference can be drawn from the evidence, we must adopt the inference that supports the verdict. A conviction may be supported solely by circumstantial evidence and, in some cases, circumstantial evidence may be stronger and more satisfactory than direct evidence. On appeal, the standard of review is the same whether the conviction relies upon direct or circumstantial evidence. An appellate court need only decide whether the evidence supporting that theory is sufficient to sustain the verdict.

(*Id.* at 4 (internal citations omitted)).

Davis does not argue that the Wisconsin Court of Appeals used the wrong standard in deciding his sufficiency of the evidence argument. Therefore, the question before me is whether the court of appeals misapplied *Jackson* or unreasonably determined the facts. In assessing whether there

- 11 -

was reasonable evidence to support Davis' convictions, as well as the party to a crime aspect of the charges, the court of appeals wrote:

> Our review of the record satisfies us that sufficient evidence was adduced at trial to support the jury's verdicts. Detectives testified about the number and apparent angle of bullet holes, and about how the angle suggested the shots were fired from a lower vehicle, like a Grand Prix, into a higher vehicle, like a Tahoe. Circumstantial evidence, like the shell casing, linked Davis and the Grand Prix to the shooting. The direction of the bullets straight toward the driver suggested intent to kill, while the circumstances of the shooting into a vehicle and possibly killing the driver suggested reckless endangerment of [Trish]. Evidence of the spent casings and testimony about hearing gunshots suggested a gun was used. A stipulation was read into the record regarding Davis's status on bond at the time of the altercation with Washington.
>
> In his responses, Davis challenges the sufficiency of the evidence that he intentionally shot, or even possessed, a gun. Indeed, the theory of defense was that no one testified they saw Davis hold, much less shoot, the weapon. However, intent can be inferred from actions, so if the jury believed that Davis was the shooter, it could infer he intentionally fired the shots. Circumstantial evidence established Davis had the gun: testimony established that the shots likely came from the driver of the smaller vehicle, and that Davis was driving a smaller vehicle both before and after the shooting. It is true that Washington testified that when he saw the Grand Prix the second time, before the shooting started, he could not see the driver, and he did not see Davis with a gun. Nevertheless, a jury could reasonbly infer that the Grand Prix's driver did the shooting, that Davis was driving the Grand Prix, and that therefore Davis fired the shots. We do not disturb the jury's factual findings unless it relied on evidence that is inherently or patently incredible. *See State v. Tarantino*, 157 Wis. 2d 199, 218, 458 N.W.2d 582 (Ct. App. 1990).
>
> Davis also raises multiple challenges to the party-to-a-crime aspect of the charges. He contends that there was no evidence of a "common design," that there was no proof of an accomplice who he could have aided or abetted, and that, because he was charged as party-to-a-crime, the State had to prove more than his direct involvement.
>
> Common design is an element of conspiracy, *see Bergeron v. State*, 85 Wis. 2d 595, 606-07, 271 N.W.2d 386 (1978), but conspiracy was not charged here. Davis was accused of either directly committing or intentional aiding and abetting the attempted homicide. Though there was not much evidence of an accomplice or an accomplice's role, there nevertheless was testimony that when the Grand Prix was stopped, there was a passenger in the vehicle. In any event, if the jury was persuaded that Davis has directly committed the crime, that was, in fact, all the State need to show on the party-to-a-crime component. *See State v. Brown*, 2012 WI App 139, ¶ 13, 345 Wis. 2d 333, 824 N.W.2d 916 (because defendant directly committed crime, he could be and was

- 12 -

> charged with party-to-a-crime liability). Ultimately, our review of the record satisfies us that sufficient evidence was adduced at trial to support the jury's verdict.

(Docket # 1-1 at 5-6.)

In short, the Wisconsin Court of Appeals concluded that the evidence would allow a jury to find, by circumstantial evidence, that Davis fired a gun while driving the Grand Prix. Upon examining the trial record, I agree. Based on the evidence in the record, I cannot conclude that no rational juror could find beyond a reasonable doubt that Davis fired the weapon from his moving vehicle, trying to kill Washington and endangering Trish in the process.

Washington testified that the first time he saw Davis was when he was driving with Trish on the night of March 9-10, 2010. (Docket # 14-6 at 89-90.) Davis pulled up beside Washington's car and spoke to them, stating that Washington should not "deal with" Trish and threatened to bust all of the windows out of Trish's car. (*Id.* at 91.) About five to ten minutes later, he saw the same car that he saw Davis in (a Grand Prix) drive past him at an intersection. (*Id.* at 94.) Once Washington turned, he was driving the same direction as the Grand Prix, which was in the outside lane; he was driving in the inside lane. (*Id.* at 95-96.) As he drove past the Grand Prix, which had slowed down, "gunshots rang out." (*Id.*)

Milwaukee Police Officer Spano testified that about 20 minutes after receiving the initial dispatch about the Grand Prix, he pulled over Davis' car. (*Id.* at 121.) When he pulled over the car, there were two black males in the vehicle. (*Id.* at 113.) He eventually identified the driver of the vehicle as Davis. (*Id.* at 118.) As he approached the vehicle, the first thing that caught his eye was spent casing that was wedged between the window gasket and the trunk. (*Id.* at 119.) The car was eventually searched. (*Id.* at 120.)

- 13 -

Detective Shannon Jones testified that when he arrived at the scene of the shooting, the area was well-lit by street lights. (Docket # 14-7 at 19-20.) He collected six 9-millimeter shell casings from the outside lane on Hampton Avenue. (*Id.* at 21-22.) He opined that this was consistent with a gun being fired from a vehicle traveling westbound on Hampton and inconsistent with a shooter standing in one place while shooting at a moving targer. (*Id.* at 24.) Detective Shannon Lewandowski testified that she was dispatched to the second part of the shooting scene, where Officer Spano had pulled over Davis' car, a maroon, four door Grand Prix. (*Id.* at 29-30.) Lewandowski testified that Spano told her about the shell casing, which she testified was on the back of the car and was a 9 millimeter casing. (*Id.* at 31-33, 35.) She noted that no gun was found when the car was searched nor when Davis or the other occupant were searched. (*Id.* at 42.)

Reginald Templin from the State Crime Lab testified that the six shell casings recovered from the street and the shell casing recovered from the trunk of the Grand Prix matched, meaning that they were fired from the same gun. (Docket # 14-8 at 10-11.) Detective Luke O'Day testified that he was dispatched to the hospital to meet with Washington. (*Id.* at 15.) Washington identified Davis as the driver of the Grand Prix from a photo array. (*Id.* at 18-19.) O'Day testified that he recovered jacketings from the driver's side passenger seat and the rear cargo area of the Tahoe as well as a "fired deformed lead projectile bullet" in the driver's seat. (*Id.* at 20-21.) He further testified that the damage to the car was centered on the passenger side rear quarter panel. (*Id.* at 22.) O'Day returned to the Tahoe and used trajectory rods, and from that he, along with an identification technician, determined that all of the bullets traveled from the rear right of the vehicle to the front left of the vehicle. (*Id.* at 23, 27.) He testified this was consistent with a gun being fired from another car that was positioned behind the Tahoe in the lane next to it. (*Id.* at 27-28.) He also testified that the bullets'

- 14 -

trajectories came from a lower angle, suggesting that the shots were fired from a vehicle lower than the Tahoe. (*Id.* at 29.) O'Day also opined that the bullet casing found wedged on the trunk lid would have come from a gun being fired out of the window of that car. (*Id.* at 30.)

The evidence against Davis is certainly not direct evidence that he committed the crimes of which he was convicted. Indeed, even Washington admitted that he did not see who was driving the Grand Prix the second time he saw it and that he could not say for sure the shots came out of that car (because the car was behind him). However, the evidence is not of so little probative value that no reasonable trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. Washington identified Davis as the person who spoke to him and Trish that night and he testified that it was the same vehicle that was driving near him right before the gunshots started, even though he never saw the driver of that vehicle. Washington testified that it had been only about five to ten minutes since Davis spoke to them from his car. Officer Spano testified that he located the Grand Prix about 20 minutes after receiving the initial dispatch about the car. Davis was driving that vehicle. It would not be unreasonable for a jury to deduce that Davis was also driving the vehicle at the time of the shooting—between when Washington saw him driving and Officer Spano identified him as the driver of the vehicle.

Multiple law enforcement officers testified about the shell casing wedged between the rear windshield and the top of the trunk, and O'Day testified that he believed the only way it could have gotten there is if someone was firing a gun out of that car's window. The jury was entitled to believe that testimony. Additionally, Templin testified that the shell casing found on the trunk matched the shell casings recovered from the road. Furthermore, Jones' testimony that he did not believe that the location of the casings would be consistent with someone standing on the side of the road shooting at a moving vehicle (O'Day also testified to this) reinforces a finding that the shots were fired out of

- 15 -

a vehicle. The jury could have reasonably deduced that the shots must have been fired from a vehicle, specifically from the Grand Prix Davis was found driving (if the shell casing only got there by being fired out of the car and that shell casing matched the ones from the street, the shots must have come from that car). The jury was also entitled to believe O'Day's opinion, based on the trajectory rods, that the shots were fired from a lower vehicle (like a Grand Prix) and angled such that they originated from the rear passenger side and traveled at an angle to the front driver's side of the vehicle. The angle, which was consistent, evidences intent to kill the driver of the Tahoe (thereby endangering the passenger).

Again, the state's evidence was circumstantial, and the jury's conclusions were based on circumstantial evidence. However, the use of circumstantial evidence rather than direct evidence does not contravene federal law. *See, e.g.*, *Holland v. United States*, 348 U.S. 121, 139-40 (1954) (holding that circumstantial evidence that convinces a jury beyond a reasonable doubt is sufficient to sustain a conviction and explaining that "[c]ircumstantial evidence . . . is intrinsically no different from testimonial evidence."). The test is not the type of evidence—direct or circumstantial—but whether reasonable inferences can be drawn to support a conviction when the evidence is considered in the light most favorable to the prosecution. *See Jackson*, 443 U.S. at 319 (internal citation omitted). Here, the testimony described above was sufficient for a rational jury to find that the State had circumstantially proven Davis was driving the vehicle and that he fired shots into the Tahoe from the vehicle, attempting to kill Washington and endangering Trish.

Davis also argues that the State failed to prove the "party to a crime" aspect of the charges. Part of his argument is that the State could not prove he was a direct actor, but as has been discussed above, there was sufficient evidence for the jury to find all the essential elements of the charged crimes beyond a reasonable doubt. As to his argument that there was no evidence of an accomplice

or that he was an aider and abettor, the Wisconsin Court of Appeals correctly explained that all the state had to show as to the party to the crime component was that Davis was the direct actor. *See State v. Brown*, 2012 WI App 139, ¶ 13, 345 Wis. 2d 333, 339-40, 824 N.W.2d 916, 920; Wis. Stat. § 939.05(2).

"Challenging the sufficiency of the evidence is a tough undertaking at best." *United States v. Holstein*, 618 F.3d 610, 612 (7th Cir. 2010) (internal citation omitted). Davis has failed to meet his burden. Based on the foregoing, the Wisconsin Court of Appeals decision was not an objectively unreasonable application of clearly established federal law nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. Accordingly, the petition is denied.

## CERTIFICATE OF APPEALABILITY

According to Rule 11(a) of the Rules Governing § 2254 Cases, the court must issue or deny a certificate of appealability "when it enters a final order adverse to the applicant." A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make a substantial showing of the denial of a constitutional right, the petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893, and n. 4). In this case, reasonable jurists would not find the court's decision to deny the petition on substantive grounds debatable or wrong. Thus, the court will deny a certificate of appealability as to Davis' claims.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the petitioner's petition for a writ of habeas corpus (Docket # 1) be and hereby is **DENIED**.

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**.

**IT IS ALSO ORDERED** that a certificate of appealability shall not issue.

**FINALLY, IT IS ORDERED** that the Clerk of Court enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 30th day of November, 2016.

BY THE COURT

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge